IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STATE FARM MUT. AUTOMOBILE INS. CO. and STATE FARM FIRE AND CAS. CO., | : : | CIVIL ACTION |
| v. | : | |
| ARNOLD LINCOW, D.O., et al. | : | NO. 05-5368 |

**MEMORANDUM AND ORDER**

THOMAS J. RUETER                                                                                November 30, 2010
Chief United States Magistrate Judge

        On March 26, 2009, judgment in the amount of $4,049,741.00 was entered in favor of plaintiff ("State Farm") and against defendant Arnold Lincow, D.O. ("Lincow") and several other defendants. The court molded the verdict to $12,149,223.00 after trebling. Punitive damages in the amount of $5,000,000.00 also were assessed against Lincow. Lincow has not satisfied the judgment. Lincow filed a Claim for Exemption (Doc. Nos. 812, 876, 1014). State Farm contends that two specific assets listed on Lincow's Claim for Exemption are not exempt under Pennsylvania state law. The two assets at issue here are: (1) AXA Equitable Accumulator IRA Rollover Account # XXXXX-5023 ("AXA Equitable IRA"), and (2) TD Ameritrade IRA Account # XXXXX-0199 ("TD Ameritrade IRA").

        A hearing on this issue was held on August 23 and 24, 2010. The parties submitted Proposed Findings of Fact and Conclusions of Law on October 18, 2010 (Doc. Nos. 1066 (Lincow), 1067 (State Farm)). At the court's request, the parties submitted Supplemental Proposed Findings of Fact and Conclusions of Law (State Farm's submitted on November 15,

2010 and Lincow's submitted on November 16, 2010). The parties agree that the relevant statutory provision is 42 Pa. Cons. Stat. Ann. § 8124(b)(1)(ix), which states, in pertinent part, as follows:

> (b) Retirement funds and accounts. –
>
> (1) Except as provided in paragraph (2), the following money or other property of the judgment debtor shall be exempt from attachment or execution on a judgment:
>
> (ix) Any retirement or annuity fund provided for under section 401(a), 403(a) and (b), 408, 408A, 409 or 530 of the Internal Revenue Code of 1986 . . ., the appreciation thereon, the income therefrom, the benefits or annuity payable thereunder and transfers and rollovers between such funds. This subparagraph shall not apply to:
>
> . . .
>
> (B) Amounts contributed by the debtor to the retirement or annuity fund in excess of $15,000 within a one-year period. This shall not include amounts directly rolled over from other funds which are exempt from attachment under this subparagraph.

42 Pa. Cons. Stat. Ann. § 8124(b)(1)(ix).

Generally, the party asserting the exemption bears the burden of proving that the exemption applies. Alliance Home of Carlisle v. Bd. of Assessment Appeals, 919 A.2d 206, 225 (Pa. 2007). Cases addressing 42 Pa. Cons. Stat. Ann. § 8124(b)(1) specifically have held that the party seeking the exemption must submit proof to support the claim that the exemption applies; the party opposing the exemption bears the burden to challenge its application. Marine Midland Bank v. Surfbelt, Inc., 532 F. Supp. 728, 730 (W.D. Pa. 1982). See also Navistar Fin. Corp. v. Hrobuchak, 2009 WL 483123, at *2 (M.D. Pa. Feb. 25, 2009) (party claiming exemption under § 8124(b)(1)(ix) must submit evidence to trigger the application of the exemption; onus on party

2

opposing the exemption to prove existence of exception under the statute). Exemption statutes "have as their object the protection of the judgment debtor, not the protections of creditors." In re Lowenthal, 203 B.R. 576, 582 (Bankr. E.D. Pa.1996) (citing Mayhugh v. Coon, 331 A.2d 452, 455 (Pa. 1975)). "Consistent with the overall trend nationally, exemption statutes in Pennsylvania are to be liberally construed so as to effect the remedial purposes for which they were enacted and to promote justice." Id. at 583 (footnote and citations omitted).

State Farm urges, inter alia, that these IRAs are not tax qualified, or have been disqualified, and, therefore, they are not exempt under Section 8124(b)(1)(ix). Lincow disagrees, arguing that the plans only need be "provided for under" the relevant provisions of the Internal Revenue Code ("IRC") in order to be exempt under the statute. In Kaplan v. First Options of Chicago, Inc., 189 B.R. 882 (E.D. Pa. 1995), the court, considering Section 8124(b)(1)(ix) and an account under Section 401(a) of the IRC, concluded that "[l]anguage such as 'provided for under' seems to indicate that in order to establish a valid exemption under the Pennsylvania statute, the pension plan would have to comport with I.R.C. §401(a). Thus, the Pennsylvania statute seemingly requires a plan to be tax qualified in order to be exempt for bankruptcy purposes." Id. at 890 (footnote omitted). The court noted, however, that "[n]otwithstanding this language . . . there is evidence to suggest that the intent of the Pennsylvania legislature in enacting the statute was to create a provision which would grant broad protection to pension plans." Id. Considering these competing interests, the court in Kaplan concluded that it "is not entirely persuaded that tax qualification under the I.R.C. is essential to establishing a valid exemption, for bankruptcy purposes, pursuant to the Pennsylvania statute." Id.

This court need not balance these competing interests as it finds that Lincow sufficiently proved that the IRAs are exempt under the statute, and State Farm did not prove that an exception to that exemption is applicable.

**1.     MMC and 7622 Medical Center**

Several corporate and partnership entities are among the named defendants in this lawsuit. Two of these defendants are relevant to the discussion herein: Medical Management Consulting, Inc. ("MMC") and 7622 Medical Center, P.C. ("7622 Medical Center"). MMC was formed in August 20, 1979 (Ex. L-24) and Lincow was employed by MMC from 1979 to 2006. (N.T., 8/24/10, at 38.) At all times relevant hereto, Lincow was the president and sole shareholder of MMC. (N.T., 8/23/10, at 21.) Lincow also was employed by 7622 Medical Center from 1979 to 2009 and, at all times relevant hereto, Lincow was the sole owner of 7622 Medical Center. Id. at 60-61.

**2.     AXA Equitable IRA**

State Farm argues that Lincow failed to present sufficient evidence to meet his burden of proving that the AXA Equitable IRA is exempt from execution. State Farm contends, inter alia, that a break or breaks occurred along the chain of funds currently in the AXA Equitable IRA, which disqualify this plan from being exempt from execution under the Pennsylvania exemption statute. Under the relevant statute quoted above, any break in the chain of rollovers from qualified to qualified retirement account would defeat Lincow's current claim of exemption with respect to those funds. State Farm acknowledges that the AXA Equitable IRA "consists entirely of funds which were once held in the Medical Management Consulting Pension Plan." (State Farm Proposed Finding of Fact No. 10.) It is necessary, therefore, to examine the

4

flow of the funds in the AXA Equitable IRA from inception to the current date to determine if Lincow succeeds on his claim for exemption.

The funds in the AXA Equitable IRA can be traced back to a profit sharing plan at MMC that was adopted effective September 1, 1979 (Ex. L-25) (the "First MMC Plan"). MMC next adopted a Defined Benefit Pension Plan effective September 1, 1980 (Ex. L-26) ("MMC Defined Benefit Plan"), and the funds were transferred into this new plan. MMC adopted another profit sharing plan effective September 1, 1985 (the "Second MMC Plan"), and this plan was restated in its entirety effective January 1, 1989. (N.T., 8/23/10, at 30.) Lincow was the trustee of the Second MMC. Id. at 22-23, 30. The Second MMC Plan was a qualified profit sharing plan under Section 401(a) of the IRC. The Internal Revenue Service ("IRS") issued a determination letter that the Second MMC Plan in place in 1989 and 1990 was qualified under Section 401(a) of the IRC. (N.T., 8/24/10, at 101-02, 109-10.) Lincow, as trustee of the Second MMC Plan, never received notification from the IRS that the Second MMC Plan was disqualified. Id. at 30. At some time prior to August 31, 1985, the MMC Defined Benefit Plan was frozen (the "Terminated Plan") and the funds therein were transferred to the Second MMC Plan to be administered with that plan but held in segregated accounts for each of the participants in the MMC Defined Benefit Plan. (N.T., 8/24/10, at 29, 56-64, 97; Exs. P-7 to P-15.)

As of January 1, 2000, the Second MMC Plan was amended and restated to form a 401(k) profit sharing plan and trust ("MMC 401(k)"). (N.T., 8/23/10, at 51, 135-36; Ex. L-32.) MMC and Lincow, as trustee, executed a 401(k) Profit Sharing and Trust Agreement in December 1999. (N.T., 8/24/10, at 150-51; Ex. L-32.) In July 1999, the funds in the MMC 401(k) were transferred from a Charles Schwab custodial account to a new account at Alliance

5

Capital. (N.T., 8/23/10, at 122-26; Ex. L-12.) The MMC 401(k) as amended in 2000, is a profit sharing plan provided for under Section 401(a) of the IRC. Id. at 152-53. The IRS issued an advisory letter to MMC's third party administrator that as of May 24, 2002, the form used to create the MMC 401(k) was qualified under Section 401(a) of the IRC ("Volume Submitter Determination Letter"). Id. at 112-14, 153-54; Ex. L-33. The MMC 401(k) was modified in 2003. (N.T., 8/24/10, at 152; Ex. L-43.) The documentation from the modification included the May 24, 2002 Volume Submitter Determination Letter. Id.

In 2004, David Pozzi, an investment broker working with Lincow, recommended changing the MMC 401(k)'s custodian from Alliance Capital to AXA to diversify the plan's assets. (N.T., 8/23/10, at 133-35.) On December 15, 2004, Lincow completed an enrollment form for an AXA Momentum series account and elected not to participate in the 401(k) portion of the plan. Id. at 134-36; Ex. L-21. The funds in the MMC 401(k) were transferred into an AXA Equitable Momentum Series account (the "Momentum Account"). The MMC 401(k) remained open until 2006. MMC filed its final tax return with the IRS for the year ending August 31, 2006. (N.T., 8/23/10, at 171-72; Ex. L-24.) The MMC 401(k) terminated effective December 31, 2006. (N.T., 8/23/10, at 23-26, 137-38; 8/24/10, at 31-34; Exs. L-6, L-7.) The MMC 401(k) was terminated because neither MMC nor 7622 Medical Center had made any contributions to the plan since 2000, no employees continued to work for MMC, and MMC had terminated its business operations because Lincow was moving to Philadelphia. (N.T., 8/24/10, at 32-34.) At the time the MMC 401(k) terminated on December 31, 2006, Lincow's allocated share of the plan held in the Momentum Account was $1,446,205.37. (N.T., 8/23/10, at 28-29;

Ex. L-8.) The AXA Equitable IRA was opened in 2007 with a transfer of Lincow's share of the funds from the MMC 401(k).

Lincow elected to have his funds under the MMC 401(k) rolled over from the Momentum Account to an accumulator IRA account. Id. at 27-28, 138; Ex. L-6. On January 24, 2007, Lincow opened the AXA Equitable IRA. (N.T., 8/23/10, at 19-21; Exs. L-4, L-5.) On February 22, 2007, the funds in Lincow's participant account in the Momentum Account were liquidated and, on February 26, 2007, were rolled over into the AXA Equitable IRA. (N.T., 8/23/10, at 20, 29, 139; Exs. L-8 to L-10.) Lincow did not incur any income tax liability relating to the distribution because it was a direct rollover of plan assets from the Momentum Account into the AXA Equitable IRA. (N.T., 8/23/10, at 30-33, 173-77, 187-90; Ex. L-10.) Lincow never made any contributions to the AXA Equitable IRA. (N.T., 8/23/10, at 139-40.) As of June 30, 2010, the value of the AXA Equitable IRA is $1,057,192.30. Id. at 15-16; Ex. L-3.

State Farm sets forth several arguments to counter Lincow's claim that the funds in the AXA Equitable IRA are exempt from execution. As noted above, State Farm urges that a break or breaks along the chain of rollovers from qualified account to qualified account can render a judgment debtor unqualified for the exemption under Pennsylvania law. (State Farm Proposed Finding of Fact ¶¶ 145, 148.) State Farm has failed to show that such a break in the chain occurred. The court acknowledges that the documentary evidence was sparse. However, Lincow, the trustee of most, if not all, of the plans that culminated in the AXA Equitable IRA, consistently testified that he understood that the plans were qualified under the IRC. The documentary evidence showed that the plans, from the inception with the First MMC Plan through to and including the AXA Equitable IRA, have been handled as qualified plans with

respect to tax returns and internal rollover procedures. The IRS in its 1989/1990 IRS Determination Letter, about which the parties, including State Farm's expert, testified, determined that the plan in effect in the 1989 and 1990 time frame was a qualified plan. The May 24, 2002 IRS advisory letter, the "Volume Submitter Determination Letter," advised that, as of that date, the form used to create the MMC 401(k) was qualified under Section 401(a). Lincow never received notice that a plan was unqualified or disqualified.

State Farm presented the expert testimony of P. Dermot O'Neill. Mr. O'Neill acknowledged that the MMC 401(k) effective January 1, 2000 was a plan provided for under Section 401(a) of the IRC. (N.T., 8/24/10, at 151; Ex. L-32.) Mr. O'Neill admitted that the IRS issued a determination letter that the plan in effect in 1989 and 1990 was qualified under the IRC. (N.T., 8/24/10, at 101-03.) The expert testified that the May 24, 2002 Volume Submitter Determination Letter was an advisory letter issued by the IRS that the master or form plan used to prepare the plan at that time had been determined to be appropriate for purposes of Section 401(a) of the IRC. Id. at 112.

State Farm focused on transactions that, it urged, could have disqualified the plans. Mr. O'Neill testified regarding an alleged withdrawal of life insurance proceeds from the MMC 401(k) by Lincow in 1999 in the approximate amount of $344,000, which the expert characterized as a potential prohibited transaction that may disqualify the plan. Id. at 119-20, 127, 134, 140; Ex. P-18. The assets of the MMC 401(k) transferred in 1999 to the new custodial account at Alliance Capital, included life insurance policies on Lincow and certain other employees. The trustee, Lincow, decided to surrender the insurance policies and transfer the cash surrender proceeds to the MMC 401(k). (N.T., 8/24/10, at 62-64.) In 1999, Lincow's life

insurance policy held by the MMC 401(k) was surrendered and the proceeds, approximately $340,000.00, were transferred within the MMC 401(k) to a segregated account. Id. at 63-64, 66, 80-84; Ex. L-29. Lincow testified that he never took the insurance assets or proceeds out of the MMC 401(k). (N.T., 8/23/10, at 133; 8/24/10, at 63-64, 80-84, 136-48, 178-80.) Mr. O'Neill acknowledged that a spreadsheet related to the plan reflected an amount equal to the insurance proceeds as still being an asset of the plan held in two separate funds. (N.T., 8/24/10, at 139-46; Ex. P-18.) An IRA form 5500 for the MMC 401(k) for the year 1999 did not report a withdrawal or distribution from the plan or any non-exempt transactions. (N.T., 8/24/10, at 134-38; Ex. L-30.)

The evidence supports Lincow's explanation that the $344,000 cash surrender value of his life insurance was not withdrawn from the plan but, rather, was invested in the plan in two separate funds. Mr. O'Neill acknowledged that if this explanation were true, the liquidation of the life insurance and investment of those funds in the plan would not disqualify the plan. (N.T., 8/24/10, at 172-73.) State Farm's expert further admitted that even if a prohibited transaction were to occur with respect to the MMC 401(k) plan, a prohibited transaction does not necessarily mean a plan is disqualified as the IRS may permit corrective actions. (N.T., 8/24/10, at 148-49.) Mr. O'Neill testified that a plan may be disqualified for a number of reasons. Id. at 104-08, 149-50. However, he was unable to determine whether the instant plans were qualified, not qualified, or had been disqualified. Id. at 124-27, 148-49, 172.

State Farm argues that this court should draw an adverse inference from Lincow's testimony that the MMC Defined Benefit Plan was terminated at some time prior to 1985, and

9

the funds in that plan were "frozen."[1] (N.T., 8/23/10, at 97-98.)  State Farm argues that this court should draw an adverse inference and find that the funds in the MMC Defined Benefit Plan were frozen because the plan was not a qualified plan. (State Farm Finding of Fact ¶148.) Lincow testified that he was did not know where the funds frozen in the MMC Defined Benefit Plan ultimately went. Id.  Lincow testified that the funds were transferred into the next MMC plan, but then acknowledged that he was unsure. Id.  State Farm admits that the frozen funds "may have been transferred" into the next plan created by MMC, see State Farm Proposed Finding of Fact ¶149, and, therefore, the transfer of funds from a disqualified plan renders all subsequent plans disqualified.  The court rejects this argument finding that Lincow proved by a preponderance of the evidence that the plans were qualified and that State Farm failed to rebut the evidence presented by Lincow.

This court finds that the evidence supports the conclusion that the funds in the AXA Equitable IRA have been held in qualified plans and rolled over, numerous times, into the AXA Equitable IRA.  The evidence supporting this conclusion includes the testimony of the

---

[1] State Farm argues that the court should make numerous adverse inferences against Lincow and find the plans to be unqualified because of the lack of documentary evidence submitted by Lincow.  For example, State Farm urges this court to make an adverse inference that Lincow made contributions in excess of the maximum amounts permitted in Section 8124(b)(1)(ix)(B) and, therefore, an exception to the exemption applies.  This court acknowledges that Lincow did not present much documentary evidence regarding the plans. Lincow admitted that he, at times, did not personally search for documents that might have shed greater light on the status of the plans.  However, the court accepts the testimony of Mrs. Barbara Lincow that she, in an effort to help her husband, personally attempted to locate all documents regarding the plans.  The fact of the matter is that State Farm presented no evidence to establish that the plans were unqualified or disqualified, or that an exception to the state exemption applies.  State Farm's evidence consisted mainly of asking the court to draw adverse inferences from the record.  State Farm's expert was able to raise suspicions regarding some of the plans, but was unable to drawn any conclusions from the record to rebut Lincow's evidence.

trustee of the plans, Lincow, testimony of professionals who prepared tax returns reflecting no irregularities with respect to the plans, the IRS determination letter from 1989/1990, the Volume Submitter Determination Letter, the existence of appropriate documents establishing the plans, and the fact that the IRS never disqualified any of the plans. See Kaplan v. First Options of Chicago, Inc., 189 B.R. 882, 890-91 (E.D. Pa. 1995) (when determining if a plan is tax qualified, "it [is] wise to defer to the IRS," noting that the "weight and force of determination letters is enhanced by limited circumstances in which IRS issues them"). Other evidence to consider includes a lack of action by the IRS against the IRA and the absence of any disallowed tax benefits due to the operation of the plan. Id. at 891. This type of evidence is enhanced if "all required tax returns and actuarial reviews have been filed on behalf of the Plan." Id. No evidence was presented that the tax documents for the plans were not filed. For these reasons, Lincow has sufficiently carried his burden of proving that the AXA Equitable IRA is exempt from execution under Section 8124(b)(1)(ix).

    3.    **TD Ameritrade IRA**

On or around March 26, 1986, Lincow opened an IRA at Janney Montgomery Scott. (N.T., 8/23/10, at 91; Ex. P-4.) Lincow identified this account as a personal IRA. (N.T., 8/23/10, at 86.) On March 26, 1986, Lincow made a contribution of $2,000 to the Janney Montgomery Scott IRA. (Ex. P-4.) On April 17, 1986, $11,202.66 was credited to this IRA and included the notation "CST/TRF/A S LINCOW." (N.T., 8/23/10, at 93-94; Ex. P-4.) Lincow testified that he did not deposit this amount into the IRA but explained as follows: "There was supposed to be a contribution. On page three [of Ex. P-4] there's a reduction of credit of $11,202.66, then there's also a qualified debit of $11,202.66. . . . So, that is a fictitious

11

number showing up that was never really entered. The stock was never bought or delivered."
(N.T., 8/23/10, at 94.)

The statement for the TD Ameritrade IRA revealed that, in January 1990, 1,261.279 shares of stock valued at $20,483.17 was an asset of the IRA. On December 4, 1991, the funds in the Janney Montgomery Scott IRA, $25,633.55, were rolled over into an IRA from The Equitable Life Assurance Society of the United States. (Ex. P-3.) On September 28, 2001, the funds, $44,400.20, were rolled over to a Charles Schwab IRA account. (N.T., 8/23/10, at 88-90; Ex. P-3.) As of September 30, 2009, the balance of the Schwab IRA was $61,339.65 and included investments in a Schwab cash reserve fund, two stock portfolios, and two private placement investments with Legg Mason Real Estate. (N.T., 8/23/10, at 12; Ex. L-2; Cole Dep.[2] at 20 and Ex. J-3.) Lincow did not make any contributions to the Schwab IRA. (Cole Dep. at 45.)

On December 16, 2009, Lincow executed an account transfer form to transfer the funds in the Schwab IRA to the TD Ameritrade IRA. (Cole Dep. at 18-20 and Ex. J-3.) On January 7, 2010, $2,828.78 was deposited into the TD Ameritrade IRA, representing the transfer of the cash reserve assets from the Schwab IRA, and two deposits were made from publicly-traded mutual funds in the amount of $19,508.13. (Cole Dep. at 21-22 and Ex. J-4.) On February 12, 2010, stock certificates in the amount of $47,500 were transferred into the TD Ameritrade IRA representing the individual stock interest purchases that the Schwab IRA made from 2005 to 2009 into the Legg Mason investment. (Cole Dep. at 23 and Ex. J-4.)

---

[2] The deposition of Jason Cole was admitted into evidence as Exhibit L-28.

State Farm asserts that the TD Ameritrade IRA is non-exempt because Lincow made impermissible contributions to the account while held by Janney Montgomery Scott. (State Farm Finding of Fact ¶ 168.) The TD Ameritrade IRA is an account under Section 408(a) of the IRC and, in order to be exempt under Section 8124, State Farm urges, the account must comply with the requirements of Section 408(a). Section 408(a) defines an individual retirement account, in pertinent part, as:

> A trust created or organized in the United States for the exclusive benefit of an individual or his beneficiaries, but only if the written governing instrument creating the trust meets the following requirements:
>
> (1) Except in the case of a rollover contribution . . ., no contribution will be accepted unless it is in cash, and contributions will not be accepted for the taxable year on behalf of any individual in excess of the [deductible amount] for such taxable year under section 219(b)(1)(A).

26 U.S.C. § 408(a). For the years 1982 through 2001, the annual deductible amount was $2,000.00. 26 U.S.C. § 219(b)(1)(A). During the time the funds were held by Janney Montgomery Scott, Lincow was permitted to contribute $2,000.00 per year to his account. State Farm urges that the evidence shows that Lincow contributed $13,202.66 to this IRA in 1986 ($2,000.00 on March 26, 1986 and $11,202.66 on April 17, 1986); and $20,483.17 in stock in 1990. (Ex. P-4.) State Farm argues that these contributions mean that the Janney Montgomery Scott IRA was not qualified under Section 408(a) of the IRS and, therefore, any new account into which those funds were rolled over, such as the TD Ameritrade IRA, is not entitled to exemption under Section 408(a). State Farm contends that the TD Ameritrade IRA must be qualified under Section 408(a) of the IRC before it is eligible to be exempt from execution under Section 8124(b)(1)(ix). Lincow disagrees urging that the language of the statute requires that the plan be

"provided for under" Section 408(a) of the IRC in order to be exempt from execution. (Lincow's Proposed Conclusions of Law ¶¶ 3, 4.)

As noted above, the court in Kaplan v. First Options of Chicago, Inc., 189 B.R. 882, 890 (E.D. Pa. 1995), considering Section 8124(b)(1)(ix) and an account under Section 401(a) and also considering the intent of the Pennsylvania legislature in enacting the statute was to create a provision which would grant broad protection to pension plans, and concluded that it "is not entirely persuaded that tax qualification under the I.R.C. is essential to establishing a valid exemption, for bankruptcy purposes, pursuant to the Pennsylvania statute." Id.

This court need not balance these competing interests as it finds that Lincow did not make disqualifying contributions to the Janney Montgomery Scott IRA in 1986 or 1990. On March 26, 1986, Lincow opened the IRA with a $2,000.00 contribution to the Janney Montgomery Scott IRA. On April 17, 1986, $11,202.66 was credited to this IRA and included the notation "CST/TRF/A S LINCOW." (Ex. P-4.) This notation indicates that the $11,202.66 was a transfer into the account from a custodian, not a contribution by Lincow. This notation supports Lincow's testimony that he did not make a contribution in this amount into the Janney Montgomery Scott IRA. While Lincow was unsure in his testimony in August 2010 regarding exactly what these funds represented or from where they came in 1986, the account statement reveals that the funds were a transfer into the Janney Montgomery Scott IRA from another custodian. Direct transfers from one custodian to another do not constitute contributions for the purposes of Section 8124(b)(1)(ix)(B). See In re Allen, 228 B.R. 132, 138 (W.D. Pa. 1998).

State Farm also asserts that a contribution of stock to the Janney Montgomery Scott IRA in 1990 disqualified the plan under Section 408(a). The account statement dated April

14

24, 1987, indicates that two "principal purchase[s]" were made of the following items: (1) "Decatur Income Fd Inc." and (2) "Decatur Fd Inc Decatur 1." (Ex. P-4.) The next account statement is dated November 25, 1989 to December 29, 1989. (Ex. L-11.) The total account value of the IRA on this statement was listed as $0.19. (N.T., 8/23/10, at 112-14; Exs. P-4, L-11.) The account statement for the time period of December 30, 1989 to January 26, 1990, revealed that 1,261.279 shares of the "Delaware Gp Decatur 1 - Fd Inc Decatur 1 Ser" now were an asset of the plan. (Ex. P-4.)

Lincow testified that he did not make any contributions to this IRA in 1990. (N.T., 8/23/10, at 96.) The evidence shows that Lincow did not make a contribution of stock to this IRA in 1990. Rather, the account statements reveal that principal purchases of stock were made which became assets of the account. Lincow testified that an accounting error by Janney Montgomery Scott resulted in the account being valued at $0.19. The evidence revealed no distributions or withdrawals from the account since its inception in 1986 and, therefore, supports Lincow's explanation that the $0.19 valuation of the account in late 1989 was an error. The court finds that the TD Ameritrade IRA is provided for under Section 408(a) for the purposes of Section 8124(b)(1)(ix) and is exempt from execution under Section 8124(b)(1)(ix).

This court has considered the entire record and all arguments of the parties. For the above reasons, it is hereby

**ORDERED**

1. The Claim for Exemption is **GRANTED**;

2. The AXA Equitable IRA is exempt from execution under 42 Pa. Cons. Stat. Ann. § 8124(b)(1)(ix); and

3. The TD Ameritrade IRA is exempt from execution under 42 Pa. Cons. Stat. Ann. § 8124(b)(1)(ix).

BY THE COURT:

/s/ Thomas J. Rueter
THOMAS J. RUETER
Chief United States Magistrate Judge